In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3955

DAVID FELDMAN,

*Plaintiff-Appellant,*

*v.*

OLIN CORPORATION, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 09-168-GPM—**G. Patrick Murphy**, *Judge.*

ARGUED APRIL 19, 2012—DECIDED AUGUST 27, 2012

Before EASTERBROOK, *Chief Judge*, and FLAUM and
WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* In May 2007, David Feldman
was working as a tractor operator on the day shift at
a manufacturing facility then owned by Olin Corpora-
tion. Because of Feldman's medical problems with
fibromyalgia and sleep apnea, his doctors had advised
him to work regular day positions, without rotation and
overtime. This was possible until Olin realigned its work

force, causing Feldman's position to change from one limited to daytime work to one that required rotation among day, evening, and night shifts. Although he tried to work under the new regime for a few weeks, Feldman found that his fatigue and pain made it impossible for him to do so. When he presented Olin with a medical restriction from the shift rotation, Olin promptly laid him off. It did not place him in a different position, because (it asserted) no other positions were available that did not require overtime or flex-time. Over the course of the next several months, Olin continued to refuse to place Feldman in another spot, maintaining that either flex-time or overtime were essential functions for everything that was available. Finally, a straight-day position came open in December 2007; Feldman successfully bid for it. Since then, Feldman has continued working at the plant.

Feldman brought this suit alleging that the defendants' failure to offer a reasonable accommodation in the form of a straight-day shift, without overtime, violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 *et seq.* He also argued that once he returned to work, Olin retaliated against him for having filed discrimination complaints with various state and federal agencies. Feldman also brought claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and state law retaliation claims, but those are not at issue on this appeal.

The district court granted summary judgment in the defendants' favor, dismissing all of Feldman's claims.

We conclude, however, that this was error. Feldman can prevail if the trier of fact resolves two genuinely disputed points in his favor: first, whether he is "disabled" under the ADA, and second, whether he is "qualified" to work in certain positions given his overtime restriction. Feldman's retaliation claims, in contrast, were properly dismissed for lack of evidence that the adverse employment actions were caused by any protected conduct. Finally, both parties on appeal have discussed sanctions. As we explain below, Feldman's attorneys failed to file a timely notice of appeal from the order awarding sanctions against them, and so we lack jurisdiction to consider it. Feldman's appeal from the court's denial of his own motion for sanctions is, however, properly before us, and we conclude that the district court rejected it too hastily. We thus remand that issue to the district court for further consideration.

## I

The account of the facts that follows presents them in the light most favorable to Feldman, who was the party opposing summary judgment. See, *e.g., Lagestee-Mulder, Inc. v. Consolidated Ins. Co.*, 682 F.3d 1054, 1056 (7th Cir. 2012). In general, our review is *de novo.*

Since 1974 Feldman has worked at the metal manufacturing facility in East Alton, Illinois, in a variety of production and manual labor positions. Until November 2007, this was the brass division of Olin. In November 2007, defendant Global Brass & Copper, Inc., a Dela-

ware corporation, acquired that division. It now operates the same facility under the name Olin Brass, but the true entity is GBC Metals, LLC, whose sole member is Global Brass. Unless the context requires otherwise, as it does when we come to the question of sanctions, we refer to both defendants as Olin.

For many years Feldman typically worked the swing shift (or "flex-time"), which required him to work day, afternoon, and midnight rotating shifts along with some overtime. Things changed when, in 2002, Feldman was diagnosed with fibromyalgia. According to Feldman's rheumatologist, Dr. Tanphaichitr, as well as his general practitioner, Dr. Green, Feldman experiences significant pain, sporadic sleeping patterns, insomnia, and extreme fatigue as a result of the fibromyalgia. Working the swing shift was exacerbating these symptoms, and so toward the end of 2004, Dr. Green recommended that Feldman switch to a "straight-time" schedule. An employee on a straight-time shift is assigned a daytime shift of eight hours, without rotation to afternoons and nights. Dr. Green recommended this schedule for Feldman because it would allow him to have a more stable sleep cycle, which in turn would help to reduce pain and fatigue. Following his doctor's advice, Feldman bid on and obtained a straight-day tractor-operator position in January 2005. In February 2005, Feldman submitted a no-overtime medical restriction. Olin agreed to honor this restriction after consulting with Dr. Green. Feldman has also since been diagnosed with obstructive sleep apnea. During a sleep study conducted in 2007,

Feldman's sleep efficiency (that is, the amount of time he actually slept) was rated as "very poor at 48%."

On May 7, 2007, Olin implemented a "job curtailment," which involved realigning or reducing several positions. As part of that process, it changed one tractor-operator position from straight days to a rotating shift. Because Feldman was the least senior of the straight-day tractor operators, he was the one moved into the new job. Feldman tried to follow the rotating schedule for two weeks, but he was unable to do so because of his physical condition. On May 21, 2007, Feldman submitted a new doctor's note restricting him from flex-time shifts; relying on that, he asked to be assigned to a straight-day shift. Olin told Feldman that there were no available straight-day positions, and Feldman was laid off that day.

On June 11, 2007, Feldman filed a Charge of Discrimination with the Illinois Department of Human Rights, alleging disability and age discrimination. On June 20, 2007, Olin held a reasonable accommodation meeting. It sent a Position Statement to the Illinois Department of Human Rights in response to the discrimination charge, stating that it had considered Feldman for a variety of positions but could not place him given his restrictions. Olin also sent Feldman's doctor, Dr. Green, questions about his medical restrictions, and Dr. Green responded that Feldman's "fibromyalgia and obstructive sleep apnea cause significant symptoms in terms of physical pain and excessive sedation," and that a day shift would allow Feldman to "have a reduction in pain and reduction in daytime somnolence so

that he would be able to perform the functions of his job." Olin did not at that time offer Feldman alternative employment, and so Feldman remained on layoff status.

For the most part, Feldman did not work during the remainder of 2007, although he submitted several unsuccessful bids for open positions. In December 2007, however, he bid on and was awarded a position working straight days as a tractor operator.

Feldman brought this suit against Olin Corporation, Global Brass, and Olin Brass, on March 4, 2009, alleging that the defendants had committed age and disability discrimination in violation of the ADEA and ADA by failing to accommodate his disability between May and December of 2007. He also included a claim for retaliation. The district court granted summary judgment to the defendants on all claims; Feldman has appealed only from the adverse rulings on the ADA and retaliation claims.

## II

To succeed on a claim under the ADA, a plaintiff must show: "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000). Feldman argues that Olin failed to make a reasonable accommodation when it did

not offer him an available position after he alerted the company to his flex-time and overtime restrictions.

The district court concluded, after looking at the summary judgment record, that Feldman could not show that he was disabled; it therefore saw no need to address the other ADA requirements. In our view, however, when the record is viewed in the light most favorable to Feldman, there is a dispute of material fact on that threshold issue. In addition, we conclude that a dispute of material fact exists with respect to Feldman's qualification to perform available positions. There is no dispute that Olin failed to offer Feldman those positions as a reasonable accommodation, and so we take that as established.

## A

An individual is "disabled" under the ADA if he (1) has an actual disability that substantially limits one or more major life activities, (2) has a "record of" such an impairment, or (3) his employer regards him as having such an impairment. *Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011) (citing 42 U.S.C. § 12102(2) (2006)).[1] Feldman argues that he is disabled because of substantial limitations in his ability to sleep, a major

---

[1] Although this definition changed with the 2009 amendments to the ADA, the amendment was not retroactive and the parties agree that Feldman's claim is controlled by the earlier definition. See *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009).

life activity. See *Scheerer v. Potter*, 443 F.3d 918, 919 (7th Cir. 2006); *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 616 (5th Cir. 2009) ("Every circuit that has addressed the issue has concluded that sleeping is a major life activity."). In the alternative, Feldman asserts that a jury could find that Olin regarded him as being substantially limited in his ability to work, also a major life activity, see *Powers*, 667 F.3d at 817. Feldman alleges that the latter argument is supported by the fact that Olin had a "100% healed policy." We address each of these in turn.

1

A plaintiff claiming disability on the basis of sleep problems must show that his "limitations on sleeping . . . are sufficiently 'prolonged, severe and long-term' to warrant classification as a disability." *Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 784 (7th Cir. 2007) (quoting *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 757 (7th Cir. 2006)). Summary judgment for the defendant, however, may be appropriate if the plaintiff relies only on "generalized assertions that she is unable to sleep for substantial periods of time, unsupported by any additional evidence, medical or otherwise, and unenhanced by claims that this lack of sleep affects her daytime functions." *Squibb*, 497 F.3d at 784.

Olin relies on these cases to argue that Feldman's claim, too, should fail. But Feldman's case does not suffer from the same defect. He presented significant evidence of severe sleep problems resulting from sleep

apnea and fibromyalgia, including medical evidence from his treating physicians and the results of a sleep study. He did not rely solely on his own say-so, although his deposition testimony and the records he kept from 2005 to 2007 documenting his sleeping difficulties bolstered the medical evidence.

The district court nonetheless granted summary judgment for Olin because it thought that some facts in the record cast doubt on the severity of Feldman's sleeping limitations. It noted that (1) Feldman's sleep quality is better if he uses a CPAP machine (a mask that delivers continuous positive airway pressure), (2) Feldman's doctor said that he could work 40 hours a week of straight-time shifts, and (3) Feldman is able to drive and engage in some recreational activities. Perhaps these pieces of evidence do cut in Olin's favor; they suggest that Feldman's sleeping problems might not be a "disability" for ADA purposes because they are easily remedied or do not significantly affect his daytime functions. The question, however, is not whether there was some evidence in the record favoring Olin; it is whether there was anything on the other side of the scale.

The answer to the latter question is yes. First, it is not clear that the CPAP machine actually helps Feldman, even if it theoretically ought to. Feldman testified that it was difficult to wear the mask at night and thus the machine did not work as effectively as possible. A jury could conclude that even with a CPAP machine, Feldman would have significant sleeping problems. Second, although Feldman's doctor advised he could

work 40 hours a week, he emphasized that this was only if Feldman was not assigned to work flex-time. The doctor believed that Feldman's sleeping problems were substantial enough to make a change in schedule neces-sary. The fact that Feldman could have worked in some capacity during the day cannot be enough to over-come Feldman's other medical evidence of sleeping problems. To hold otherwise would be akin to saying "that no one is disabled under the ADA unless the person is unable to work," which would "render all the provisions in the ADA governing reasonable accom-modations at work entirely empty of meaning." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311 (3d Cir. 1999). Finally, even though some evidence indicates that Feldman is able to do things like go to movies and attend church, other evidence shows that Feldman has significantly reduced his social activities because of his pain and sleeping difficulties.

On this record, we cannot conclude as a matter of law that Feldman is not disabled. The evidence supporting Feldman's claim is sufficient to create a genu-ine dispute of material fact that he was disabled by a substantial, severe, and long-term limitation on his ability to sleep.

2

Feldman's alternative argument that he is disabled because Olin regarded him as substantially limited in his ability to work is another matter. In order for

Feldman to satisfy the "regarded as" theory of ADA disability, there must be evidence that Olin believed Feldman was "limited in [his] ability to perform not merely one particular job but a class or broad range of jobs." *Hanson v. Caterpillar, Inc.*, ___ F.3d ___, 2012 WL 3139946 (7th Cir. Aug. 3, 2012) (quotation omitted). The most the evidence shows is that at the time Olin laid him off, it regarded Feldman as unable to perform jobs that re-quired overtime or flex-time. *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 725 (7th Cir. 1998) (an inability to "work long shifts" or be available for on-call duties does not "rise to the level of disability required under the ADA") (quotation omitted).

Even taking into account Olin's alleged "100% healed policy," our analysis does not change. As we explained in *Powers*, "[w]ithout some evidence that the employer actually viewed the . . . individual as unable to work for other employers in a class of jobs or a broad range of jobs, a 100% healed policy merely shows that *this* employer's preference is to hire someone without any impairments. Under the ADA that would not be a violation unless the individual is actually disabled." 667 F.3d at 815.

B

Feldman has shown that a dispute of fact exists on the question whether he is disabled, but to survive sum-mary judgment he must also show that he is a "qualified individual," *i.e.*, that he is "an individual with a disability

who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Olin argues that Feldman cannot meet this requirement because overtime and rotating shifts—exactly the job demands from which Feldman needed to be excused—are "essential functions" of the job.

We generally defer to an employer's determination of the essential functions of a job. See *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines what functions are essential, and we will not second-guess that decision."). But this does not mean that we completely abdicate independent review. The ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Under ADA regulations, "other factors to consider are: (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)). Thus we "consider, but [are] not limited to, evidence of the employer's judgment as to which functions are essential, and the written job description in effect before the employee

interviewed for the position*." Serednyi v. Beverly Health-care, LLC*, 656 F.3d 540, 550 (7th Cir. 2011).

Feldman points to several straight-time positions that were open during his seven month lay-off that he believes Olin should have reassigned him to, including two straight-time shifts in the bag house and four adjustor positions. Olin retorts that all of these required overtime as an essential function of the job. Once again, however, we cannot resolve this in Olin's favor at the summary judgment stage, because the evidence on each of these points is mixed. Notably, Olin concedes that overtime is not listed as a required job feature in the written job descriptions. Olin counters that it should not have to list a requirement that is required by *all* of its jobs, but Feldman points to evidence of some jobs that do specifically list mandatory overtime as a requirement in their written descriptions. Feldman has also furnished data indicating that overtime is rarely worked by bag house operators. On the other hand, Olin argues that the consequences of exempting bag house workers from overtime would be dire, as fires sometimes break out that require all essential personnel to work until the fires are put out, even if that requires overtime. There is evidence, in short, going both ways, and so we cannot conclude that overtime was an essential function of the bag house or adjustor positions. See *D'Angelo*, 422 F.3d at 1232-33 (evidence that employees rarely performed a task created a genuine issue of material fact regarding whether the task was essential).

Olin also argued that Feldman could not have obtained the bag house positions because he needed to

bid on the vacant positions, and because he was not entitled to bump junior employees currently holding those positions. (These arguments do not appear to apply to the adjustor positions, for which Olin relies solely on the overtime defense.) But Olin has failed to press these points on appeal and they are thus waived. Even if they were not, we do not think the evidence is so clear that these positions were unavailable to Feldman that summary judgment would be appropriate. For instance, the evidence suggests that Olin treated Feldman as being on "curtailment," a status that gave Feldman the right under the applicable collective bargaining agreement to bump junior employees. Even when employment practices generally require bidding before being awarded a position, we have held that employers may be required to bypass procedural requirements like bidding in order to meet their obligations under the ADA of providing reasonable accommodations. See, *e.g.*, *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000). Feldman's alleged failure to bid on certain open positions is thus not dispositive.

Olin's argument that flex-time was an essential function of certain positions (such as the tractor-operator positions) is stronger than its argument with respect to overtime. Flex-time was mentioned in the written job descriptions, and there is no evidence that truck drivers who are in flex-time positions actually work straight shifts instead. But we need not resolve this one way or the other because we find that Feldman has presented enough evidence to establish a genuine dispute of material fact about his qualification to work available

straight-time positions, and Olin did not offer him those positions. This is enough to withstand summary judgment on his ADA claim.

**III**

Feldman also appeals the district court dismissal of his retaliation claim. To prevail on this theory, a plaintiff must show that he engaged in statutorily protected activity (such as filing a charge of discrimination), that he suffered a materially adverse employment action, and that there is a causal link between the two. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 677 (7th Cir. 2010). Feldman alleges that he engaged in statutorily protected activity by filing a charge of discrimination with the Illinois Department of Human Rights alleging disability and age discrimination in September 2006 and again in June 2007, and in August 2007 by filing a discrimination charge with the EEOC. He asserts that Olin retaliated against him by refusing to rehire him, by assigning him to physically demanding work upon his return in December 2007, and by suspending him for minor misconduct in May 2008.

We agree with the district court that Feldman cannot succeed on his retaliation case because there is no genuine dispute over causation. The evidence regarding Olin's refusal to rehire Feldman (until December 2007) suggests that Olin was strictly applying its overtime and flex-time requirements, not that Olin was retaliating against Feldman for filing charges of discrimination.

Feldman points to nothing suggesting that Olin's failure to put him back to work before December 2007 had anything to do with his charges of discrimination. Although the evidence does indicate that Feldman was assigned unpleasant tasks upon his return to work, such as the coil-miller job, this task was performed by others as well. There is no evidence that Feldman's assignment to the coil-miller job was punitive or involved anything more than what the job typically required. See *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009). Finally, we agree with the district court that the eight-month period between the latest filing and the his suspension in May 2008 is too long, absent some other evidence, to establish a casual connection between the two. See *Wallscetti v. Fox*, 258 F.3d 662, 669 (7th Cir. 2001) ("[T]he length of time between the protected speech and the adverse employment action is at least four months, which, without more, is too long to support a reasonable inference of causation."). Feldman believes that his infraction—crashing a tractor into a door—was too minor to warrant a suspension (and indeed, during a subsequent union grievance process the company reduced the length of the suspension), but the real problem is that there is nothing to connect this suspension to his earlier activity. We thus affirm summary judgment for Olin on Feldman's retaliation claims.

**IV**

Our final task is to address the appeals of various sanctions matters. The night before the district court was to hear oral argument on the summary judgment

motions, one of the defendants in this case, Global Brass, filed a motion for sanctions against Feldman pursuant to Rule 11. Global Brass argued that Feldman had failed to conduct a proper investigation before filing his complaint against it, had failed to dismiss Global Brass after Global Brass offered evidence that it never employed Feldman and never employed more than 10 people (and so was not covered by the ADA), and that Feldman failed to omit Global Brass from his amended complaint. Feldman, in turn, filed a motion for Rule 11 sanctions against Global Brass, on the basis that Global Brass's motion for sanctions was for the improper purpose of harassing counsel and because Global Brass failed to give him 21 days' notice of its intent to seek sanctions, as required by Rule 11(c)(2). See *Matrix IV, Inc. v. American Nat'l Bank & Trust Co. of Chicago*, 649 F.3d 539 (7th Cir. 2011) ("This 21-day window gives the offending party a 'safe harbor' within which to withdraw or correct the offending pleading.").

On November 29, 2010, the district court granted Global Brass's motion for sanctions; it relied on both Rule 11 and its inherent powers. It reserved judgment on the amount of attorney's fees it would impose. The court denied Feldman's motion for sanctions. Several months later, on February 22, 2011, the court awarded attorney's fees of $1,475, to Global Brass to be paid by Feldman's attorneys. Feldman's attorneys seek to have those fees reversed, and Feldman argues that his own sanctions motion was improperly rejected. We review the grant or denial of a motion for sanctions for abuse of discretion. *Bilharz v. First Interstate Bank of Wisconsin*, 98 F.3d 985, 989 (7th Cir. 1996).

1

We are sympathetic to Feldman's contention that the district court abused its discretion by imposing sanctions. Global Brass admits that it never gave Feldman advance notice as required under Rule 11(c)(1). Notice plays a central part in the Rule 11 process, as the 1993 Committee Note emphasizes. Subdivisions (b) and (c), ¶ 13. That alone should have led to the dismissal of the motion. And it is our impression that Global Brass's argument on the merits for sanctions was flimsy. Sanctions would have been appropriate only if Feldman had no legal basis or evidentiary support for keeping Global Brass in the case as a defendant, or was doing so for an improper purpose. But Feldman's lawyers had good reason to think that Global Brass was a proper defendant. There was evidence in the record including pay stub records, job postings, and a letter from defendant's counsel identifying Global Brass as Feldman's employer, all suggesting that Global Brass might have been the entity employing Feldman. The confusion about the precise relationship among the three corporate defendants persists in this court, exacerbated by the defendants' failure to follow another procedural rule—this time, Federal Rule of Appellate Procedure 26.1, which requires parties to submit a Corporate Disclosure Statement. The defendants failed to comply with that rule, and their carelessness has needlessly complicated both our review for conflicts and our substantive evaluation of this part of the case.

As it happens, however, we have no jurisdiction to address this issue, because Feldman's attorney failed to

file a timely notice of appeal from the district court's final decision on sanctions. Feldman filed a notice of appeal from the November 29, 2010, grant of the motion for sanctions, but that order was nonfinal, because it explicitly reserved the calculation of fees. When the fees were ultimately imposed by the court's order of February 22, 2011, Feldman failed to file a notice of appeal. This defect was brought to Feldman's attention during the course of briefing in this case. His attorneys tried to salvage the appeal, raising several arguments and filing a late notice on August 3, 2011. We dismissed that appeal as untimely. See *Feldman v. Olin Corp.*, *et al.*, 673 F.3d 515 (7th Cir. 2012).

Despite their earlier lack of success, Feldman's attorneys are now asking us to treat the first notice of appeal filed by Feldman from the November order as effective on the date in February the fees were imposed. This is possible, they contend, under Federal Rule of Appellate Procedure 4(a)(2). But they are mistaken. FRAP 4(a)(2) permits courts to treat a notice of appeal filed after a court announces a decision or order, but does not formally enter final judgment, as filed on the date of the entry of the judgment or order. But this rule applies "only when a district court announces a decision that would be appealable if immediately followed by the entry of judgment." *FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*, 498 U.S. 269, 276 (1991). The Supreme Court has specifically said that Rule 4(a)(2) does not "permit[] a notice of appeal from a clearly interlocutory decision—such as a discovery ruling or a sanction order under Rule 11 of the Federal Rules of Civil

Procedure—to serve as a notice of appeal from the final judgment" because "[a] belief that such a decision is a final judgment would not be reasonable." *Id*.; see also *Carter v. Ashland, Inc.*, 450 F.3d 795, 797 (8th Cir. 2006) ("We conclude Rule 4(a)(2) does not save the instant notice of appeal filed prematurely from the dismissal order, because the order 'left unresolved' the amount of the attorney's fees and costs."). Nor does Rule 4(a)(4)(B)(i) help. That rule applies to motions for attorney's fees only "if the district court extends the time to appeal under Rule 58," FED R. APP. P. 4(a)(4)(A)(iii), and the court did not do so here.

We note that one other jurisdictional defect dooms this appeal. As we explained in our earlier rejection of the attorneys' late attempt to appeal the fees, the district court ordered Feldman's *attorneys* to pay the fees in its February order, not Feldman, thereby "relieving the plaintiff of the obligation imposed by the previous order." 673 F.3d at 516. Thus, even if we were somehow to find the early notice of appeal to be effective at a later date, any issue Feldman might have had with those fees is now moot. Feldman's attorneys were the only parties who could appeal a fee award imposed against them, but they did not file an appeal from the November order and their attempt to file an appeal from the February order was far too late. We therefore find that we have no jurisdiction to review the award of attorney's fees to Global Brass.

2

We do, however, have jurisdiction to consider the district court's denial of Feldman's own motion for sanctions against Global Brass, because Feldman filed a timely notice of appeal from that order. We review a district court's denial of a motion for sanctions for abuse of discretion. *Matrix IV, Inc.*, 649 F.3d at 552.

The only explanation the district court offered for its rejection of Feldman's motion for sanctions was that "Mr. Feldman's claims against Global Brass and Copper were groundless." We think that goes too far. As noted above, Feldman offered evidence showing that he had a good faith basis to keep Global Brass in the case, given the confusion about Global Brass's relationship to Feldman and the exact corporate identity of his employer during the relevant time. *Cf. Tucker v. Williams*, 682 F.3d 654, 662 (7th Cir. 2012) (finding a sanctions award to be an abuse of discretion when there was no evidence the party had acted in bad faith). Global Brass was hardly a model litigant, given the fact that it filed its motion for sanctions on the eve of oral argument and failed to follow the safe-harbor provisions of Rule 11. That alone, we recognize, would probably not warrant sanctions: lawyers file untimely motions all the time, and the normal response from the judge is simply to deny them and move on. But here the judge seems to have accepted Global Brass's position that Feldman never should have sued it on the merits. That conclusion— if indeed our guess about the district court's thinking is correct—is much more troublesome, given the evidence we mentioned earlier.

"Although our review of a denial of sanctions is limited, the denial of sanctions with no explanation may constitute an abuse of discretion." *Ross v. City of Waukegan*, 5 F.3d 1084, 1088 (7th Cir. 1993); see also *LaSalle Nat'l Bank of Chicago v. County of DuPage*, 10 F.3d 1333, 1338 (7th Cir. 1993) ("[A] district court abuses its discretion when it denies sanctions with no explanation, or with an explanation that is so conclusory that the appellate court cannot review the substance of its decision.") (citations omitted). Given the complexities of the corporate relationships involved here and the lack of explanation from the district court, we need a better explanation before we can endorse the court's decision to deny Feldman's motion. We thus reverse the district court's denial of Feldman's motion for sanctions.

* * *

In summary, we REVERSE the district court's grant of summary judgment in Olin's favor on Feldman's ADA claim (and thus VACATE the associated entry of costs of $13,035.20 imposed against the losing party), AFFIRM summary judgment for Olin on Feldman's retaliation claim, DISMISS the appeal from the award of sanctions in favor of Global Brass for want of jurisdiction, and REVERSE the denial of Feldman's motion for sanctions. The case is REMANDED for further proceedings consistent with this opinion.